# United States Court of Federal Claims

No. 04-254 C
February 27, 2006

| | |
|---|---|
| **Liberty Mutual Insurance Co.,** | Equitable Subrogation; Suretyship; Miller Act Payment Bond; Jurisdiction; Waiver of Sovereign Immunity; *Dicta*; Notice of Default; Actual Knowledge; Satisfaction of Claims; Payment in Full; Advisory Opinions |
| ***Plaintiff,*** | |
| **v.** | |
| **United States of America,** | |
| ***Defendant.*** | |

Timothy Heffernan, Alex Lamme, and Kirk McCormick, Watt, Tieder, Hoffar & Fitzgerald, L.L.P., McLean, VA, for plaintiff.

Thomas Dinackus, James Kinsella, David Cohen and Peter D. Keisler, United States Department of Justice, Washington, DC, for defendant.  Cpt. Patrick Butler, United States Army Legal Services Agency, of counsel.

## OPINION AND ORDER

**Block,** *Judge.*

This case involves the intricacies of suretyship law.  In particular, the primary (and seemingly simple) issue is one that has bedeviled this court since its founding in the mid-Nineteenth Century: under what circumstances may a surety sue the United States?  Correspondingly, since all federal courts are courts of limited jurisdiction, what exactly is the jurisdictional predicate for such a suit?  Indeed, while circumstances may create inequities if such suits are not allowed, it is well worth remembering that the United States is shielded by the armor of sovereign immunity, which unless pierced by the arrow of an explicit waiver, even fairness itself is of subordinate importance. *See, e.g.*, *United States v. Lee,* 106 U.S. 196, 205, 1 S. Ct. 240, 27 L. Ed. 171 (1882).  A then-judge Benjamin Cardozo summarized this dilemma: "Jurisdiction exists that rights may be maintained. Rights are not maintained that jurisdiction may exist." *Berkovitz v. Arbib*, 230 N.Y. 261, 374 (1921) (Cardozo, J.).

But, implementation of the doctrine of sovereign immunity is not the sole culprit here.  Our juridical system, derived from the English common law, works best to the extent that precedential

court opinions, pursuant to the doctrine of *stare decisis*,[1] produce coherent and predictable results.[2] Nevertheless, at times factual and doctrinal complexity gives rise to a tangled web of law woven in overlapping cocoons of contradictory doctrine and unpredictable application. Such has been the case in federal suretyship law, particularly when what has been at issue is the very jurisdiction of the courts to hear such claims. The interpretation of case law in this area—and the application of controlling precedent—is at the very core of the dispute in the instant motions.

Plaintiff, Liberty Mutual Insurance Company ("Liberty"), is a Miller Act[3] surety that provided performance and a payment bonds on behalf of its insured, Enron Federal Solutions, Inc. ("EFSI") (a subsidiary of Enron Corporation). EFSI was the prime contractor for Contract No. DACA51-99R-006 ("the contract") between EFSI and the United States Army, under which EFSI was to obtain legal ownership of four utility systems at Fort Hamilton, New York, perform capital improvements to the systems, and then operate and maintain the systems for ten years. *See* Def.'s Mot. to Dismiss or, In the Alternative, for Summ. J. at 3 (hereinafter "Def.'s Mot."). Under its performance bond, Liberty guaranteed that it would complete, or finance the completion of, the contract if EFSI defaulted or was unable to perform, thereby protecting the government's interest in having the contract completed. Under its payment bond, Liberty promised to pay subcontractors, suppliers, and materialmen if EFSI failed to pay them.

When EFSI's parent declared bankruptcy, EFSI abandoned the contract, subsequently declared bankruptcy itself, and—after "rejecting" the contract in bankruptcy—was terminated for default by the Army. Liberty subsequently honored its payment bond and paid outstanding claims of EFSI's subcontractors.

Claiming it is equitably subrogated to EFSI's rights under the contract, Liberty sued the government for reimbursement out of contract funds that Liberty maintains are owed to it and its insured, EFSI. Before the court are defendant's motions to dismiss for lack of subject matter jurisdiction, or, in the alternative, for summary judgment. For the reasons stated below, defendant's motions are denied.

---

[1] It is interesting to note that the doctrine is of ancient lineage (and, hence, so too is the problem of its application). The maxim, *stare decisis et non quieta movere* (stand by the thing decided; do not disturb the calm), the full predicate of the more modern usage "*stare decisis*," was cited very early on in the English common law. *See generally* P. Winfield, THE CHIEF SOURCES OF ENGLISH LEGAL HISTORY 148 (1925).

[2] *See* R. Posner, THE FEDERAL COURTS 421 (1985); R. Wasserstrom, THE JUDICIAL DECISION 60-73 (1961); Hardisty, REFLECTIONS ON STARE DECISIS, 55 IND. L. J. 41 (1979) (arguing that the objectives of a precedential system—certainty, reliance, and efficiency—are fostered by the orderly development of binding, well-reasoned legal principles derived from judicial opinions).

[3] 40 U.S.C. § 270 *et. seq.* The Miller Act requires prime contractors to post bonds on federal construction contracts.

# I. Factual Background[4]

The Army and EFSI entered into the contract on December 2, 1999, under which EFSI was to obtain legal ownership of four utility systems at Fort Hamilton, New York, upgrade the systems, and then operate and maintain them for ten years. DPFUF at 1. Liberty provided performance and payment bonds with regard to the contract. *Id.* Per the terms of the bonds, in the event of a default by EFSI, Liberty was obliged to step in and complete or finance performance on behalf of EFSI or make payments to EFSI's subcontractors, depending on the nature of the default.

On December 2, 2001, EFSI's parent company, Enron Corporation, filed a petition for a Chapter 11 bankruptcy reorganization. P.'s Resp. to DPFUF at 2. Three days later, EFSI abandoned performance of the contract. DPFUF at 1. The Army sent EFSI a cure notice, with a copy to Liberty, on December 5. *Id.* at 2. EFSI did not resume performance of the contract and instead filed for bankruptcy on December 21. Pl.'s Resp. to DPFUF at 2. At the time EFSI abandoned the contract, defendant had received but not paid two EFSI invoices for $211,262.95 each, representing EFSI's performance payments for October and November 2001.

When EFSI defaulted on the contract, defendant suspended what had to that point been regular monthly progress payments. *See* Def.'s App. at 43-46. The contracting officer, William E. Campbell, stated that he suspended any payments to EFSI "to protect the Government's interest in ensuring that the money due under the contract was paid to the appropriate party." Def.'s Supp. App. at 6 (Decl. of William E. Campbell).

EFSI rejected the contract with the Army in its bankruptcy proceeding on February 19, 2002, and the Army was released from the automatic stay so that it could terminate the contract and seek available remedies. *See* Pl.'s App. at 4-7. That same day, Liberty requested relief from the automatic stay in a bankruptcy court filing, "so that Liberty may enforce all of its rights and remedies with respect to the Contract . . . including equitable subrogation remedies." *Id.* at 8-9. In its bankruptcy court filing, Liberty noted that after honoring its payment bond, "a surety obtains a direct equitable interest in, *inter alia*, payments due pursuant to the underlying construction contract." *Id.* at 16. Anticipating liability under either EFSI's performance or payment bonds, Liberty noted that it would become "equitably subrogated to EFSI and any subcontractors and materialmen" and informed the bankruptcy court that "the automatic stay may prohibit Liberty from protecting or utilizing its rights, remedies, and claims." On February 21, 2002, the bankruptcy court granted Liberty relief from the stay "to enforce its rights of subrogation under those surety bonds and applicable law, including, but not limited to, the right for Liberty to collect the Contract funds from the Government under the Contract, if any such right or funds exist." *Id.* at 22-23.

On February 26, 2002, the Army terminated EFSI's contract for default. Def.'s App. at 31-36. The next day, defendant wrote to Liberty's claims representative and provided "proper

---

[4] These facts are taken from the Complaint, the parties' briefs, Def.'s Proposed Findings of Uncontroverted Fact ("DPFUF"), Pl.'s Resp. to DPFUF, Pl.'s Proposed Findings of Fact ("PPFUF"), Def.'s Resp. to PPFUF, the Appendix to Def.'s Mot. ("Def.'s App."), Plaintiff's Appendix ("Pl.'s App."), and Def.'s Supp. App.

notification of adverse action taken against EFSI," and referred to Liberty's payment and performance bonds. *Id.* at 30. The letter indicated that the Army wished to "commence discussions regarding the completion of the subject contract" and signaled interest in a "takeover agreement" involving Liberty to that effect. *Id.* As late April 29, 2002, it appears that defendant was still contemplating enforcing Liberty's performance bond, *see id.*, but it never did enforce the performance bond and Liberty never completed the contract or paid for its completion. Pl.'s Resp. to DPFUF at 3.

Instead, Liberty honored its payment bond and paid three EFSI subcontractors who had outstanding claims against EFSI. Liberty paid Welsbach Electric Corp. $337,052.50; it paid four claims of Rosewood/AFC JV in the amount of $659,679.71, $102,596.67, $220,831.51 and $43,986.86; finally, it paid AKF Engineers $10,000. Def.'s Resp. to PPFUF at 6-9. In at least two instances, including one of the Rosewood/AFC JV payments and the payment to AKF Engineers, it appears that Liberty disputed the amount of each subcontractor's claim and reached a mutually agreeable settlement with that subcontractor. *See* Def.'s App. at 50-62. Thus, some of Liberty's payments were not a dollar-for-dollar satisfaction of the subcontractors' initial claims. In exchange for each of these payments Liberty received a "Full and Final Release, Assignment and Guarantee of Claim" that effectively eliminated the subcontractors' claims against EFSI or Liberty. Def.'s Resp. to PFUF at 6-9. All told, Liberty paid $1,400,758.47 to satisfy EFSI's subcontractors' claims pursuant to its payment bond.[5] PPFUF at 4 & n.2; Compl. at 8-9.

Even though defendant had withheld performance payments to EFSI since December 2001, terminated EFSI's contract for default in February, and notified Liberty of the termination, on March 18, 2002 defendant paid EFSI $214,102.57 for the amount due under the October 2001 performance payment, plus accrued interest.

On April 29, 2002, Liberty sent a formal letter to defendant outlining its payments under the payment bond and notifying defendant of Liberty's rights of equitable subrogation to any unpaid amounts still owing on EFSI's contract. Def.'s Supp. App. at 1-5.

To date, defendant has still not disbursed payment for EFSI's November 2001 invoice, totaling $211,262.95 plus any accrued interest (if any). Furthermore, Liberty maintains that there is at least $4.8 million in contract payments for work and services EFSI performed during the first two years of the contract, but for which it has not yet been paid or reimbursed. Compl. at 6-7.

On February 24, 2004, Liberty sued defendant for reimbursement of the payments it made to EFSI's subcontractors pursuant to the payment bond. Liberty claimed a right to the retained November 2001 performance payment and any other amounts due but still owing on EFSI's

---

[5] In its complaint, Liberty only claimed damages of $1,390,758.47 because it had not yet made the $10,000 payment to AKF Engineers. Accordingly, plaintiff may amend its complaint to reflect the current damages claim. For the purposes of this opinion, the court will treat Liberty's claim as including the final $10,000 payment.

contract.[6] In addition, Liberty claimed that the March 2002 payment to EFSI (covering the October 2001 invoice) was improper, because defendant allegedly had notice of Liberty's equitable subrogation rights and was therefore bound to make any payments to Liberty, directly.

On August 12, 2005, defendant filed the instant motion to dismiss or, in the alternative, for summary judgment. Defendant's motion challenged Liberty's ability to sue the government as a surety who honored a payment bond, asserting that the United States has not waived its sovereign immunity with respect to a payment bond surety and, therefore, this court is without jurisdiction over Liberty's claim. In the alternative, defendant moved for summary judgment on the grounds that Liberty has not established that it paid all of the subcontractors' claims in full and that defendant did not make any wrongful payments to EFSI after Liberty had asserted its equitable subrogation claim (and, therefore, there had been no improper payment).

## II. The Jurisdictional Motion

### A. Introduction

Even though there exists in this litigation overlapping substantive issues, in which resolution of some could very well resolve or obviate others, the very presence of jurisdiction as a controversy means that this issue must first be resolved independently of the others. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868). This is why the parties or the court *sua sponte*, may raise the issue of jurisdiction at any time. *Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004) (citing *Fanning, Phillips & Molnar v. West*, 160 F.3d 717, 720 (Fed. Cir. 1998)).

The prerequisite for resolving any jurisdictional issue is especially true for the Court of Federal Claims because it is a court of special jurisdiction. Absent congressional consent to entertain a claim against the United States, this court simply lacks authority to grant relief. *United States v. Testan*, 424 U.S. 392, 399 (1976). For jurisdiction to lie in any suit against the government, there "requires a clear statement from the United States waiving sovereign immunity . . . together with a claim falling within the terms of the waiver." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). Accordingly, congressional consent to suit in this court, a waiver of the government's traditional immunity, must be explicit and strictly construed. *Library of Cong. v. Shaw*, 478 U.S. 310, 318 (1986).

The Tucker Act serves as both a waiver of sovereign immunity and a jurisdictional grant for this court. *See* 28 U.S.C. 1491 ( "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied

---

[6] Liberty's claim relates primarily to reimbursements for capital improvement costs that it claims EFSI incurred performing the contract. The issue of EFSI's entitlement to any such reimbursement, however, was not the subject of defendant's pending motion, and is therefore not currently before the court.

contract with the United States."). Although the Tucker Act waives sovereign immunity and establishes jurisdiction in this court, courts have recognized that the Act does not by itself create substantive rights. *See Folden*, 379 F.3d at 1354. Instead, in order to invoke the jurisdiction of the Court of Federal Claims pursuant to the Tucker Act, a plaintiff must identify a right to money damages found in the Constitution, a statute or government regulation, or a contract. *Id.*

Here, plaintiff relies on the contract between EFSI and the government to give rise to its own substantive claim under the Tucker Act. Plaintiff claims that by paying EFSI's debts to subcontractors under the payment bond, it is entitled to assert the equitable doctrine of subrogation to "stand in the shoes" of EFSI and claim any rights available to EFSI under the contract. Among those rights, according to plaintiff, is the waiver of sovereign immunity extended to government contractors in the Tucker Act, permitting them to sue the government for contract claims.

The issue of to whose rights Liberty has been subrogated is at the core of defendant's motion to dismiss. In a nutshell, defendant argues that Liberty's theory of subrogation is wrong, and that Liberty is subrogated *only* to the rights of the subcontractors that it paid, and not to those of the prime contractor, EFSI. If true, there is a jurisdictional problem that Liberty cannot overcome: this court has no jurisdiction over claims by subcontractors against the United States. Since it is well established that subcontractors have no privity of contract with the United States, and there is no waiver of sovereign immunity that extends to them, Liberty would be unable to sue the United States if it were subrogated merely to the rights of the subcontractors. *See United States v. Munsey Trust Co.*, 332 U.S. 234, 241 (1947) ("[N]othing is more clear than that laborers and materialmen [subcontracted by a government contractor] do not have enforceable rights against the United States for their compensation.").[7]

Because of the confusing nature of the development of case law in this arena, it is helpful at this juncture to jump the gun and risk some redundancy by summarizing the court's analysis and ultimate conclusion. Precisely how this conclusion is reached will be detailed in the subsequent subsections.

To begin with, the court must determine to whose rights Liberty was subrogated when it honored its payment bond. Traditionally, the substantive rule of equitable subrogation has been established by a long line of Supreme Court opinions. Those cases have concluded that a surety is subrogated to the rights of *both* the subcontractor who it pays and the prime contractor whose debts it relieves—the plaintiff's argument here, in a nutshell. *See, e.g., Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962); *Munsey*, 332 U.S. 234; *Henningsen v. United States Fid. & Guar. Co.*, 208 U.S. 404 (1908); *Prairie State Nat'l Bank of Chicago v. United States*, 164 U.S. 227 (1896). At least, opinions in this court have interpreted the Supreme Court cases for that point. *See Balboa Ins. Co. v. United*

---

[7] The *Munsey* Court also recognized that in the event the government is a mere "stakeholder" in contract funds, *i.e.*, the funds have already been indisputably earned by the contractor and the government has no interest in those funds and the only matter to resolve is one of priority between competing creditors, then "we have recognized the peculiarly equitable claim of those responsible for the physical completion of building contracts to be paid from available moneys ahead of others whose claims come from the advance of money." *Munsey*, 332 U.S. at 240.

*States*, 775 F.2d 1158 (Fed. Cir. 1985); *United Elec. Corp. v. United States*, 647 F.2d 1082 (Ct. Cl. 1981); *United States Fid. & Guar. Co. v. United States*, 475 F.2d 1377 (Ct. Cl. 1973); *see also Globe Indem. Co. v. United States*, 84 Ct. Cl. 587 (1937) ("[S]uch right of the surety to lay claim against the Government to such [retainage] fund or securities arises only by reason of their subrogation initially to the rights of the principal, the contractor, with the United States."). Collectively, these cases established the black-letter or substantive law of equitable subrogation in this circuit.

Nevertheless, jurisdiction—perhaps assumed to exist—was never at issue, never discussed, in the Supreme Court cases noted above. Recognizing this, defendant proffers a jurisdictional challenge, one based on a recent Federal Circuit opinion, *Insurance Co. of the West v. United States*, 243 F.3d 1367 (Fed. Cir. 2001), in which the court rejected the notion that the prior mentioned subrogation cases established jurisdiction over such claims[8] and—in *dicta*—appears to have reversed the rule of equitable subrogation noted above. To be sure, the court did literally state that a payment bond surety is subrogated *only* to the rights of the subcontractor. *See Ins. Co. of the West*, 243 F.3d at 1371. Defendant seizes on this *dicta* to argue that the Federal Circuit has, therefore, abandoned Supreme Court and circuit precedent.

But defendant's argument cannot stand because the doctrine of *stare decisis* binds the court to the rule of equitable subrogation already established by Supreme Court cases—a rule of law that the Federal Circuit has always followed, notwithstanding the *dicta* from *Insurance Co. of the West* cited here by defendant. Furthermore, defendant conveniently ignores an apparent contradiction in the *Insurance Co. of the West* case itself, whereby the court in another section of the opinion did indeed recognize that the rule of equitable subrogation was long-standing and, to boot, declared that its opinion did nothing to alter that substantive rule. *See id.* at 1375 n.3 ("We believe that *Balboa* correctly states the law of equitable subrogation."). Therefore, the rule remains unchanged that a payment bond surety is subrogated to the rights of the insured prime contractor.

So subrogated, Liberty may avail itself of a waiver of sovereign immunity in the Tucker Act and enforce EFSI's contractual rights against the government. This is the long-standing jurisdictional rule that the Federal Circuit reaffirmed in *Insurance Co. of the West*. *See id.* at 1375 & n.3 ("[W]e conclude that a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States.").[9]

---

[8]  The fact that jurisdiction was implied, *sub silentio*, in these opinions means that the issue of jurisdiction may be raised anew. *See Fed. Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88, 97 (1994) ("The jurisdiction of this Court was challenged in none of these [prior actions cited by plaintiff as establishing jurisdiction], and therefore the question is an open one before us.") (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 63 n.4 (1989) ("[T]his Court has never considered itself bound [by prior *sub silentio* holdings] when a subsequent case finally brings the jurisdictional issue before us.") (alterations in original)).

[9]  As discussed below, some interpretations of the Federal Circuit's *Insurance Co. of the West* decision remain in dispute, particularly with regard to issues of subrogation. Notwithstanding these disputes, the decision reaffirmed the long-standing rule of the Supreme Court and this circuit that sureties subrogated to the rights of a contractor in privity with the government may avail themselves of the waiver of sovereign immunity in the Tucker Act.

Although the right of subrogation itself is an equitable principle,[10] and this court traditionally does not have jurisdiction over suits in equity, the law traditionally has treated the subrogated party as if it were itself in privity of contract with the government, because the surety is considered to be "standing in the shoes" of the contractor. *Id.* In such a case, as explicated more fully below, this court would have jurisdiction over Liberty's claims because jurisdiction is predicated on the express waiver of sovereign immunity found in the Tucker Act. *See id.* at 1375.

## B. By Paying EFSI's Subcontractors Pursuant to Its Payment Bond, Plaintiff Is Subrogated to EFSI's Rights

Historically, the Supreme Court and this circuit have long recognized the right of a surety to exercise the contractual rights of its insured, to which the surety is equitably subrogated when the surety is forced to honor either a payment or a performance bond. The line of cases begins with early Supreme Court opinions that recognized the priority of sureties, *vis-a-vis* third party creditors of an insured contractor, to lay claim to contract retainages held by the government.

### 1. *Prairie State* and *Henningsen*

In *Prairie State National Bank v. United States*, 164 U.S. 227 (1896), the Supreme Court took up competing claims between a surety that had honored a performance bond and those of a bank that had financed the contractor. The government had retained ten percent of the performance payments, but disclaimed any direct interest in the retainage. The Court concluded that the surety had a superior right to the retainage because the surety was entitled to assert the equitable doctrine of subrogation. *Prairie State*, 164 U.S. at 231

In defining the specific rights to which the surety was subrogated, the Supreme Court took an expansive view. It stated that the surety could exercise the contractual rights that devolved from the subcontractor, the prime contractor, and the government, as well. On one hand, the Court noted that by paying a debt due to the insured's subcontractors, the surety is substituted to the subcontractors' rights. *Id.* at 231. On the other hand, the Court also acknowledged that the surety could be subrogated "in the rights of [the insured contractor]," but gained nothing from that because the contractor failed to fully perform, did not earn the full contract balance, and was not entitled to any additional payment from the fund. *Id.* at 232 (noting that asserting the rights of the contractor "in effect, was saying that [the surety] was subrogated to no rights whatever"). Ultimately, the Supreme Court relied on the surety's subrogation to the rights and remedies "which the creditor (the United States) was capable of asserting against [the contractor], had the security not satisfied the obligation of the contractors." *Id.* Since the government would have incurred its own expenses to complete the project and drawn from the contract retainage to pay for that work, the Court reasoned that "[t]he right of [the surety] to subrogation, therefore, would clearly entitle him, when as surety, he fulfilled the obligation of [the contractor] to the government, to be substituted to the rights which the United States might have asserted against the fund." *Id.*

_____

[10] "The right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties." *Pearlman*, 371 U.S. at 137 n.12 (quoting *Memphis & L.R.R. v. Dow*, 120 U.S. 287, 301-02 (1887)).

Twelve years later, the Supreme Court addressed a similar priority issue, this time between a payment bond surety and a creditor of the contractor. *Henningsen v. United States Fid. & Guar. Co.*, 208 U.S. 404 (1908). In effect, *Henningsen* extended the rule of *Prairie State* to payment bond sureties. The Supreme Court determined that the rights of the surety were superior to creditors' because the payment bond surety was entitled to the same subrogation rights as the performance bond surety in *Prairie State*. *Henningsen*, 208 U.S. at 411-12. The surety's interest in the fund was superior to a simple creditor's because the surety "paid the laborers and materialmen, and thus released the contractor from his obligations to them, and to the same extent released the government from all equitable obligations to see that the laborers and supply-men were paid." *Id.* at 410.

### 2. *Munsey Trust Co.*

Later, in *United States v. Munsey Trust Co.*, 332 U.S. 234 (1947), the Supreme Court tried to sort through the relative priority rights of a payment bond surety and a government claim to set-off. *Munsey* did not involve bankruptcy, but a receiver was appointed[11] on behalf of the prime contractor to collect funds due on several bonded painting contracts, and the proceeds of all collections by the receiver were to be "held for the reimbursement" of the surety. *Id.* at 237-38. After the receiver demanded the contract balance from the government, the government paid $5,713, but only after deducting $6,731 that it claimed were set-offs from other, unrelated contracts on which the prime contractor owed the government money. *Id.* at 238. The surety protested this set-off by letter to the Comptroller General, and the receiver protested the set-off in the Court of Claims.

Resolving the priorities of the parties to the retained funds, the Supreme Court first noted that "[i]n these cases, it is usual for the rights relied upon to be largely derivative or subrogated ones." *Id.* at 239. At the trial level, the Court of Claims evaluated the rights of the surety and noted:

> By reason of these payments by the [surety] it became subrogated to all the rights of the [prime contractor], the laborers and materialmen, whose claims the [surety] paid, and of the Government so far as its rights under the contracts were concerned, in the balances due under the contracts in connection with which the surety made such payments, to the extent of such balances, and to the extent of payments made where such payments were less than the balances due under the particular contract.

*Munsey Trust Co. v. United States*, 67 F. Supp. 976, 977 (Ct. Cl. 1946) (citing *Prairie State*, 164 U.S. at 227)). This echoed the broad statement of subrogation in *Prairie State* and *Henningsen*.

On review, the Supreme Court evaluated the rights of the surety (acting through the receiver) through the lense of each of the contracting parties—prime contractor, subcontractor, and

---

[11] The *Munsey* Court explained the reasons for appointing a non-bankruptcy receiver to bring suit in the Court of Claims: "Such proceedings to appoint a receiver . . . are for the purpose of taking possession of a fund or property and to prevent its loss or dissipation. Insolvency is not a necessary allegation, and there [was] no claim in this case that the contractor [was] insolvent." *Munsey*, 332 U.S. at 237 n.1.

government.  Insofar as the receiver asserted any rights that inured to the prime contractor, however, it could obtain no priority benefit for the surety because the prime contractor was subject to the government's set-off claim.  *Munsey*, 332 U.S. at 240 ("Insofar as the suitor in the Court of Claims asserted the contractor's title to the sum in dispute, that court was under statutory duty to recognize the undisputed claim for damages of the United States.") (citation omitted).

Second, notwithstanding the infirmity of any claim predicated on the rights of the prime contractor, the Supreme Court noted that "the surety urge[d] that it is subrogated *also* to the rights of the laborers and materialmen whom it paid and of the United States."  *Id.* (emphasis added).  Since it was merely assessing the priority of the interests in the contract retainages, the Supreme Court concluded that subrogation to the rights of subcontractors did not avail the surety of any additional benefit.  The primary flaw was the fact that subcontractors "do not have enforceable rights against the United States for their compensation" and cannot legally acquire a lien on public buildings.  *Id.* at 241.  *Nemo dat quod non habet*—no one gives what he does not have.  The surety argued that the subcontractors could have asserted "something in the nature of a lien on the retained percentages," but the Supreme Court rejected this approach as illogical.[12]

Finally, the Supreme Court noted "[t]he surety has yet another party whose rights it would claim, if it cannot prevail by substitution for contractor or [subcontractors]"—the United States.  *Id.* at 242.  Thus, the Court evaluated the surety's priority argument in light of any contractual "rights of the United States [which] devolved upon the surety, because of its payments."  *Id.*  The Court dismissed this argument, too, as illogical.  It concluded that the contract retainages were merely security held by the government to ensure complete performance under the contract, and any contractual interest the government had in the retainages that might devolve to the surety could only be asserted in the event of a performance default.  *Id.*  Accordingly, any contract rights of the

---

[12] The logical flaw in the surety's argument focused on the timing of any claim in equity that the subcontractors could have had against the retainages:

> In relying on the rights of the [subcontractors], however, the surety must establish that those rights existed before their claims were paid.  For it is elementary that one cannot acquire by subrogation what another whose rights he claims did not have.  Once the [subcontractors] have been paid, either by contractor or surety, they have no rights in any fund.  If before they are paid, the fund to which they are said to be entitled to look is unavailable for the very reason that they are unpaid, the surety relies on nothing when it relies on these nonexistent "rights."  One who rests on subrogation stands in the place of one whose claim he has paid, as if the payment giving rise to the subrogation had not been made.  He cannot jump back and forth in time and present himself at once as the unpaid claimant and again, under the conditions as they have changed because payment was made.

*Munsey*, 332 U.S. at 242.

government to which the surety might have been subrogated would not elevate the surety's priority *vis-a-vis* the government's set-off claim.[13]

### 3. *Pearlman*

The Supreme Court revisited subrogation issues in *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132 (1962), in which a payment bond surety competed with a trustee in bankruptcy for contract retainages due the bankrupt contractor. The contractor had completed performance and therefore earned the entire balance under the contract, but failed to pay nearly $350,000 to its subcontractors—debts that were extinguished by the surety.

The trustee argued that the Supreme Court's ruling in *Munsey* should control, entitling the bankruptcy estate to priority to any retained funds over the surety. The Supreme Court, however, refused to interpret the rule of *Munsey* so broadly, and limited it to the facts of that case—where the government itself was asserting a right of set-off. *Id.* at 135-36. The Court looked to prior judicial decisions to establish that a surety acquires a property interest in a retained fund, such that the fund proceeds do not pass unencumbered into the bankrupt's estate. *Id.* at 135-36. Specifically, the Supreme Court focused on the surety's rights under the doctrine of subrogation, and noted that the Court's *Henningsen* decision had extended the rule of *Prairie State* (which involved a performance bond surety) to cover payment bond sureties, as well. *See id.* at 136-39. According to the Court there was no distinction between the rights of a payment bond surety versus a performance bond surety:

> Thus the same equitable rules as to subrogation and property interests in a retained fund were held to exist whether a surety completes a contract or whether, though not

---

[13] This court recently highlighted the divergence between the commonly applicable rule of setoff against a surety outlined in the RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY and the one that obtains in government contracts after *Munsey*:

> The RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY has rejected what has been described as the "*Munsey Trust* doctrine" whereby an obligee attempts to set off a claim against the principal obligor that arises out of a separate transaction against the secondary obligor's claim to the return performance obtained through subrogation. *See* RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY § 31 cmt. d (1996). The RESTATEMENT took this position to prevent unjust enrichment: "If, upon performance by the secondary obligor, the obligee were allowed to set off the separate claim against the secondary obligor's subrogation rights, the principle obligor would be unjustly enriched because the performance by the secondary obligor would free the principal obligor of two claims—its duty pursuant to the underlying obligation and its duty pursuant to the separate claim." *Id.* Thus, there is an important divergence between the commonly applicable law as expressed in the Restatement (Third) of Suretyship and Guaranty and that applicable to government contracts as reflected in the *Munsey Trust* decision.

*Nova Casualty*, 2006 WL 75272 at n.7 (Fed. Cl. Jan. 12, 2006).

called upon to complete the contract, it pays the laborers and materialmen.  [*Prairie State* and *Henningsen*] establish the surety's right to subrogation in such a fund whether its bond before performance or payment.  Unless this rule has been changed, the surety here has a right to this retained fund.

*Id.* at 139.

The bankruptcy trustee argued that either the Miller Act or *Munsey* had, in fact, altered the equitable doctrine of subrogation.  *Id.* at 139-41.  The Court emphatically rejected these arguments. As for the Miller Act, the Court could find no language in the statute or legislative history requiring such a change.  The Court was not persuaded that Congress "intended to repudiate equitable principles so deeply imbedded in our commercial practices, our economy, and our law as those spelled out in the *Prairie Bank* and *Henningsen* cases."  *Id.* at 140.  As for the effect of *Munsey*, the Court noted that some courts interpreted *Munsey* as abandoning the "established legal and equitable principles" of *Prairie State* and *Henningsen*, but indicated that no such interpretation was warranted and the rule of those two prior cases remained undisturbed.  *Id.* at 141.

In conclusion, and to summarize the Supreme Court's rule of equitable subrogation involving the payment bond surety of a government contractor, the Court stated:

We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; *and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.*

*Id.* at 141 (emphasis added).  Accordingly, the Supreme Court in *Pearlman* held that the surety was entitled to priority to the retained contract funds over the bankrupt's estate.[14]

### 4.  The Rule of Equitable Subrogation in the Federal Circuit

The rule of equitable subrogation stated in *Pearlman* has long been applied in the Federal Circuit.  In *United States Fidelity & Guaranty Co. v. United States*, 475 F.2d 1377 (Ct. Cl. 1973) (en

---

[14] The three-judge concurrence in *Pearlman* sheds even more light on the rule of subrogation announced in the majority opinion.  The concurring opinion ascribed to "the theory that the surety is subrogated to the claims of the laborers and materialmen which it paid"—and, seemingly, no others. *Pearlman*, 371 U.S. at 142 (Clark, J., concurring).  Therefore, "[s]ince the laborers and materialmen have no right against the funds, it follows as clear as rain that the surety could have none."  The rule regarding the rights of subcontractors, alone, was a fair expression of a well-established rule. *See, e.g.*, *Munsey*, 332 U.S. at 241.  Accordingly, the majority's interpretation of the surety's subrogation rights must have encompassed something more broad than subrogation to merely the subcontractor's rights, alone; the concurring opinion argued this broader rule would "enlarge[e] upon the rules of *Henningsen* and *Prairie State Bank*." *Id.* at 144.

banc), its predecessor the Court of Claims perused *Pearlman* and *Munsey* to determine the relative rights and standing of a payment bond surety and individual subcontractors joined in a suit against the government for a wrongful progress payment made to the prime contractor and for contract retainages.  In *USF&G*, the *en banc* panel addressed what it perceived to be an apparent conflict between these Supreme Court cases.

Echoing Justice Clark's concurring opinion in *Pearlman* (which focused on the surety's subrogation to the rights of *only* the subcontractors), the Court of Claims noted that *Pearlman* could be parsed and misinterpreted to "infer that if the subcontractors have rights to which the surety may be subrogated, then the subcontractors should be able to assert their rights directly" against the federal government.  *USF&G*, 475 F.2d at 1382.  This was especially true given the *Pearlman* Court's statement that "the Government had a right to use the retained fund to pay laborers and materialmen; . . . the laborers and materialmen had a right to be paid out of the fund."  *Pearlman*, 371 U.S. at 142.  That inference, however, would be in direct conflict with *Munsey*, which stated that subcontractors have no *enforceable* rights against the government. *USF&G*, 475 F.2d at 1382.  To resolve any ambiguity, the *en banc USF&G* court insisted that *Pearlman*'s rule of subrogation be read in its entirety, rather than in parsing:

> The dilemma may be resolved in a number of ways, but the most apparent might be by noting that the Court in *Pearlman* stated that the surety was entitled to the benefit of *all* the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid.  *The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States.  The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the defendant.*

*Id.* (second emphasis added).  Though the court concluded that the surety was not entitled to claim subrogation in this specific case because it had not satisfied the claims of all contractors (an issue discussed below), it was clear that equitable subrogation to the prime contractor's rights *could* be available to a Miller Act payment bond surety.

Later, in *United Electric Corp. v. United States*, 647 F.2d 1082 (Ct. Cl. 1981), the Court of Claims reiterated the rule of *Pearlman* and *USF&G*, albeit in a case involving only a claim by a subcontractor against the government.  The plaintiff subcontractor argued that it was entitled to assert a claim against the government for retainage after the prime contractor declared bankruptcy and the Miller Act surety declined to reimburse plaintiff for its materials (under the premise that the materials were outside the scope of the payment bond).  *See United Electric*, 647 F.2d at 1082.  The Court of Claims reaffirmed the holding of *Munsey* that subcontractors have no direct standing to sue the government on any contract between the government and a prime contractor.  It is important to note that the *United Electric* court opined that whatever "apparent" ambiguity existed between the Supreme Court's *Munsey* and *Pearlman* holdings, the Court of Claim's *USF&G* decision had "reconciled" the two decisions.  To be sure, the court in *United Electric* distinguished the plaintiff subcontractor's positions from that of a payment bond surety:

> Under this interpretation [in *USF&G*], *Pearlman* does not conflict with *Munsey* because, while the surety gains equitable rights from its subrogation to the

subcontractors' claims, its standing to sue (its ability to enforce those rights and others) comes from the fact that *it is also subrogated to, and stands in the shoes of, the contractor*, an entity which is clearly in privity of contract with the Government.

*Id.* at 1086 (emphasis added).

The Federal Circuit's approach to subrogation culminated with *Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed. Cir. 1985).  In *Balboa*, a payment bond surety[15] sued the government for performance payments made to the contractor after the surety had notified the government of an imminent default and requested that payments be made instead to the surety. *Balboa*, 775 F.2d at 1160 & n.1.  Defendant challenged the Claims Court's jurisdiction because "a surety is similar to a subcontractor, who is not in privity of contract with the Government."  *Id.*  On appeal, the Federal Circuit roundly rejected this argument, citing the long line of Supreme Court and Court of Claims precedent, discussed above, that acknowledges a surety's right to seek shelter under the doctrine of subrogation.  According to the *Balboa* court, those decisions "make it clear that a surety is *not* in the same position as that of a subcontractor or materialman." *Id.*  The surety's position *vis-a-vis* the government is more involved than that of a subcontractor:

> In contrast to a subcontractor, which has no obligations running directly to or from the Government, a surety, as bondholder, is as much a party to the Government contract as the contractor.  If the *surety* fails to perform, the Government can sue it on the bonds.

*Id.* (citing *Munsey*, 332 U.S. at 241).  In defining the scope of the surety's subrogation rights, the Federal Circuit recited the rule of *USF&G*, quoted above:

> [T]he surety was entitled to the benefit of *all* the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid.  The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States.  The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the [United States].

*Id.* at 1161 (quoting *USF&G*, 475 F.2d at 1382).  This rationale, in turn, has been embraced by subsequent Federal Circuit opinions.  *See, e.g.*, *Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344, 1351 (Fed. Cir. 2002) (noting that "[o]ur case law has long established that a surety can sue the Government in the Court of Federal Claims under the non-contractual doctrine of equitable subrogation" but distinguishing that right from a surety's ability to assert a claim before a Board of

---

[15] The court's opinion does not explicitly state that the plaintiff honored the payment bond, and not the performance bond.  Nevertheless, it does make clear that following the contractor's default, the government terminated the contract and hired another firm to complete the contract, suggesting that the plaintiff surety was *not* called upon to honor its performance bond.  Indeed, the surety *did* pay "subcontractors and material suppliers" of its insured, suggesting payment under the payment bond. *See Balboa*, 775 F.2d at 1159-60 & n.1.

Contract Appeals under the Contract Disputes Act) (quoting *Admiralty Const., Inc. v. Dalton*, 156 F.3d 1217, 1221 (Fed. Cir. 1998) (same discussion)); *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999); *Nat'l Sur. Corp. v. United States*, 118 F.3d 1542, 1545-46 (Fed. Cir. 1997) ("The Court of Claims, by whose precedent we are bound, has long recognized the surety's right to subrogation in the [retainage fund] held by the government."); *Dependable Ins. Co. v. United States*, 846 F.2d 65, 66-67 (Fed. Cir. 1988) (noting that while a payment bond surety has rights to contract retainages, the government's rights to retainages "are generally superior to those of a payment bond surety").

### 5. Did the Federal Circuit Alter the Law of Subrogation in *Insurance Co. of the West v. United States?*

In the case at bar, defendant's primary argument is that the established substantive rule that a Miller Act payment bond surety is equitably subrogated to the rights of the prime contractor cannot be relied upon for jurisdictional purposes after the Federal Circuit's decision in *Insurance Co. of the West v. United States*, 243 F.3d 1367 (2001). Defendant argues instead that only a *performance bond* surety can be subrogated to the rights of the prime contractor, and that because a mere payment bond surety is not so subrogated, it is unable to avail itself of the Tucker Act waiver of sovereign immunity.

In *Insurance Co. of the West*, a performance bond surety sued the government for wrongly paying contract funds to the prime contractor after the surety notified the government of default. The government raised two primary arguments in defense. On one hand, it argued that a recent Supreme Court case, *Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999), cast doubt on the long line of Federal Circuit cases that have been cited for the proposition that if a surety was subrogated to the rights of a contractor in privity with the government, then a waiver of sovereign immunity existed in suits by that surety against the government. *See Ins. Co. of the West*, 243 F.3d at 1371-72. On the other hand, the government also argued that even if the court accepted the proposition that the government had waived sovereign immunity for claims by a surety subrogated to the rights of a prime contractor, the circuit's precedents had "misapplied the doctrine of subrogation." *Id.* at 1375 n.3. Under this latter tack, the government argued that at least in a performance bond scenario the surety was not subrogated to the rights of the prime contractor at all and, therefore, the surety could not take advantage of any sovereign immunity waiver extending to the prime contractor. *See id.*

In addressing defendant's first argument, whether a surety may avail itself of the Tucker Act's waiver of sovereign immunity after subrogating to the rights of the prime contractor, the *Insurance Co. of the West* court ultimately concluded that the long-standing rule followed by this circuit was the proper one: "a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States." *Id.* at 1375. However, confusion was created in reaching this conclusion because the court believed that it had to abandon its former reliance on *Prairie State*, *Henningsen*, and *Pearlman* as the foundation of that rule. *See, e.g., Nat'l Sur. Corp.*, 118 F.3d at 1545-47 (discussing Supreme Court and Court of Claims preceded as "long recogniz[ing] the surety's right to subrogation in the security held by the government"). While none of those three Supreme Court cases explicitly addressed the issue of sovereign immunity and jurisdiction, the Federal Circuit had previously relied on these cases for at least implicit authority that Miller Act sureties could sue the United States. *See Nat'l Surety Corp.*

*v. United States*, 118 F.3d 1542, 1544-46 (Fed. Cir. 1997); *Balboa*, 775 F.2d 1158; *United Elec. Corp.*, 647 F.2d 1082; *USF&G*, 475 F.2d 1377; *see also Ins. Co. of the West*, 243 F.3d at 1371-72.

The government argued in *Insurance Co. of the West*, however, that the Supreme Court's decision in *Blue Fox* undermined that implicit authority. *Blue Fox* dealt with a *subcontractor's* suit against the government for damages, after the insolvent prime contractor failed to pay (the Army had required no Miller Act bond). The subcontractor claimed that § 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702 ("APA"), waived the government's immunity for the subcontractor's claim. *See Blue Fox*, 525 U.S. at 256-67. Denying the subcontractor's claim, the Supreme Court noted the "long settled rule" that sovereign immunity bars subcontractors from recovering against the government.

Even though *Blue Fox* did not involve a surety or any issues of equitable subrogation, the plaintiff subcontractor attempted to analogize his claim to that of a Miller Act surety. The subcontractor cited *Prairie State*, *Henningsen*, and *Pearlman* as authority that the Supreme Court had "suggested that subcontractors . . . can seek compensation directly against the Government." *Id.* at 264. But the Supreme Court in *Blue Fox* was keen to the distinction—the plaintiff in *Blue Fox* was merely a subcontractor who was not actually asserting any rights that belonged to the prime contractor:

> None of the cases relied upon by respondent [including *Prairie State*, *Henningsen*, and *Pearlman*] involved a question of sovereign immunity, and, in fact, *none involved a subcontractor directly asserting a claim against the Government*. Instead, these cases dealt with disputes between private parties over priority to funds which had been transferred out of the Treasury and as to which the Government had disclaimed any ownership. They do not in any way disturb the established rule that, unless waived by Congress, sovereign immunity bars *subcontractors* and other creditors from enforcing liens on Government property or funds to recoup their losses.

*Id.* at 265 (emphasis added). Since the *Blue Fox* Court was dealing solely with the relative rights of a *subcontractor*, it is likely that the Court's statement that a question of sovereign immunity was not involved in the three cited Supreme Court cases was predicated upon the fact that in those cases a surety, and not a subcontractor, was the party bringing the claim. In other words, the unstated assumption behind this statement was the belief that because the three cases were based on the well-settled doctrine of subrogation, whereby a surety stands in the shoes of the prime contractor, privity of contract existed, and because the United States is a contracting party, waiver (and therefore jurisdiction) is triggered by the Tucker Act.

Nevertheless, the *Insurance Co. of the West* court was persuaded by the government to instead interpret the above quoted statement in *Blue Fox* to mean that none of those cases (*Prairie State*, *Henningsen*, and *Pearlman*) even "involved a [that is, "*any*"] question of sovereign immunity." *Insurance Co. of the West*, 243 F.3d at 1372. As a result, the court concluded that it

> agree[d] with the government that, after *Blue Fox*, we can no longer rely on those three cases to find a waiver of sovereign immunity. The Supreme Court in *Blue Fox* stated clearly that none of those cases "involved a question of sovereign immunity."

> This court is obligated to follow the Supreme Court's interpretation in *Blue Fox* of those three cases, even though that interpretation may be dicta.

*Id.* (quoting *Blue Fox*, 525 U.S. at 265 and citing *Stone Container Corp.*, 229 F.3d at 1349-50). Despite the fact that the long-established line of surety cases had at least implicitly held that the government had waived sovereign immunity for a surety subrogated to the rights of a prime contractor, *Insurance Co. of the West* abandoned those cases as the foundation of jurisdiction for a subrogated surety.

Whatever the merits of the Federal Circuit's interpretations of *Blue Fox* in *Insurance Co. of the West*, one matter that leaps out at this court is the fact that nowhere in *Blue Fox* did the Supreme Court call into question the integrity of the *substantive* rule of equitable subrogation articulated in *Prairie State*, *Henningsen*, and *Pearlman* (the very rule defendant challenges in this case). Indeed, unlike sovereign immunity and jurisdiction, it could hardly be said that those cases did not "involve" a question of subrogation. Quite the contrary, they explicitly confronted and stated the substantive rule of subrogation. As the Supreme Court stated in *Pearlman*, a Miller Act payment bond surety is subrogated to the rights of, among others, the prime contractor that is in privity of contract with the government. *Pearlman*, 371 U.S. at 141. *Blue Fox* was not a case involving issues of subrogation at all, so there was no moment for the Court to revisit the explicit rule of *Pearlman*. *Blue Fox* merely stated the obvious: that subcontractors are not in the same position as the subrogated surety in *Pearlman* was. *Blue Fox* could hardly be interpreted to *overrule* the black letter law that a payment bond surety stands in the shoes of the prime contractor.

This discussion of *Blue Fox* leads to the second issue that the government raised in *Insurance Co. of the West* (and which parallels its argument here)—that prior Federal circuit decisions had misapplied the rule of equitable subrogation. *See Ins. Co. of the West*, 243 F.3d at 1375 n.3. In *Insurance Co. of the West*, the government tried to avoid the longstanding rule that a surety is subrogated to the rights of the insured prime contractor. It argued that the performance bond surety suing the government was subrogated only to the rights devolving from the *government*, so therefore the surety could not avail itself of any Tucker Act rights inhering to the prime contractor. *Id.* The Federal Circuit explicitly rejected this contention:

> We disagree. . . . We believe that *Balboa* correctly states the law of equitable subrogation. *Pearlman* stands for the proposition that the subrogee steps into the shoes both of the contractor against the government and the government against the contractor.

*Id.* Although also *dicta*, this statement acknowledged the continued vitality of the substantive rule of equitable subrogation enunciated in *Pearlman* and *Balboa* (decisions which are highly significant in this case because, as here, they are payment bond cases) whereby in general the surety is equitably subrogated *not only to the rights of the subcontractor who is paid, but also to the rights of the prime contractor whose debt is discharged*. Therefore, notwithstanding the Federal Circuit's interpretation of *Blue Fox* that potentially called into question the jurisdictional assumptions of *Balboa* (which, again, relied on *Prairie State*, *Henningsen*, and *Pearlman*), the circuit did reaffirm the *substantive* rule of equitable subrogation enunciated in that case and in *Pearlman*.

All the preceding, then, makes the government's primary argument in this case—and the language from the Federal Circuit's *Insurance Co. of the West* opinion on which it relies—curious. In the section of the *Insurance Co. of the West* decision addressing the implications of *Blue Fox* on the circuit's traditional sovereign immunity analysis, the court offered the following analysis of *Blue Fox*:

> There was nothing particularly novel about the Supreme Court's holding in *Blue Fox*, even as applied to a surety of a subcontractor. It is well-established that a surety who discharges a contractor's obligation to pay subcontractors is subrogated *only* to the rights of the subcontractor. Such a surety does not step into the shoes of the contractor and has no enforceable rights against the government.

*Id.* at 1371 (citing *Munsey*, 332 U.S. at 240-41) (emphasis added). According to defendant's argument in this case, by this one statement alone the *Insurance Co. of the West* court fundamentally altered established Supreme Court and circuit precedent regarding a payment bond surety's subrogation rights, narrowly construing the payment bond surety to subrogate *only* to the rights of subcontractors who are paid. *See* Def.'s Mot. at 6-13.

The chief problem, of course, is that the court's statement, taken literally, is facially inconsistent with the Supreme Court's holding on the scope of suretyship law in *Pearlman. See Pearlman*, 371 U.S. at 141. Moreover, the statement is inconsistent with the court's conclusion in the very same opinion that its earlier *Balboa* decision correctly stated the law of equitable subrogation. *See Ins. Co. of the West*, 243 F.3d at 1375 & n.3. Of course, the Federal Circuit and this court are bound by the Supreme Court precedent in *Pearlman*, and the rule of *Balboa* is binding on this court unless and until it is revisited and changed by either a supervening Supreme Court decision directly on point or an *en banc* panel of the Federal Circuit that addresses the issue. *Tate Access Floors*, 279 F.3d at 1366; *Vas-Cath*, 935 F.2d at 1563; *Kimberly-Clark Corp.*, 772 F.2d at 863. Neither is the case here.

Accordingly, the statement in question cannot be considered the holding, the *ratio decidendi*, of *Insurance Co. of the West*. Instead, it must be considered non-binding *dicta*. To be sure, *Insurance Co. of the West* did not address the relative rights of a subrogated payment bond surety because the plaintiff in *Insurance Co. of the West* was a performance bond surety. At least two other opinions from this court have addressed the argument defendant raises here, and concluded that the cited *Insurance Co. of the West* language is *dicta* that was not central to the court's holding. *See Nova Cas. Co. v. United States*, No. 04-1665 (Fed. Cl. Jan. 12. 2006); *Ins. Co. of the West v. United States*, 55 Fed. Cl. 529, 534-38 (2003). As the Court of Federal Claims noted on remand in *Insurance Co. of the West*, itself:

> The court agrees that the language in question was not central to the *West II* court's holding and may be viewed properly as *dicta*. Although Supreme Court dicta are binding on subordinate lower federal courts, the Federal Circuit has cautioned that dicta in its own decisions "should be read in the light of the court's central holding and the controlling fact in that case."

*Ins. Co. of the West*, 55 Fed. Cl. at 535 (citing *Stone Container Corp.*, 229 F.3d at 1349-50 and quoting *F. Alderete Gen. Contractors, Inc. v. United States*, 715 F.2d 1476, 1479 (Fed. Cir. 1983)).

Each of these decisions concluded that the longstanding rule that a payment bond surety is equitably subrogated to rights of *both* subcontractors and prime contractors has not been diminished by *Insurance Co. of the West*. This court agrees.[16]

Accordingly, this court holds that a surety that honors a Miller Act payment bond is subrogated *both* to the rights of the subcontractors or materialmen to whom it makes payment *as well as* the prime contractor on whose behalf such payments are made. The surety may then "step into the shoes" of its insured for purposes of asserting the right to sue the United States extended in the Tucker Act (subject, of course, to the rule of priority established in *Munsey*), just as a performance bond surety does after completing a defaulted contract. Defendant's argument to the contrary is inconsistent with Supreme Court and Federal Circuit precedent. Defendant's contention that *Blue Fox* fundamentally altered the substantive rule of subrogation in this circuit is not plausible, since

---

[16] Furthermore, it is not at all clear that the *Munsey* opinion, which the Federal Circuit cites for the proposition that a payment bond surety is subrogated only to the rights of subcontractors, stands for the cited proposition.

Instead, the cited portion of the *Munsey* opinion states the well-worn rule that subcontractors and materialmen have no enforceable rights against the United States for their own compensation. In a claim by a surety against the government where the government asserts an equitable right of setoff to achieve priority over the surety's claim, then, subrogation to the rights of the subcontractors would do nothing to improve the surety's priority. *See Munsey*, 332 U.S. at 240-41. This is the principal rule of *Munsey*. The Supreme Court noted that if the United States, and not the prime contractor, had been the party obligated to pay the subcontractors, the surety would be subrogated to the rights of the government and could then claim a priority over the government's set-off claim. *Id.* at 241 ("If the United States were obligated to pay laborers and materialmen unpaid by a contractor, the surety who discharged that obligation could claim subrogation [to the government's contract rights]."). However, since the subcontractors "do not have enforceable rights against the United States for their compensation" the surety could hardly claim that it was discharging an obligation of the government. *Id.*

That is not to say, however, that the *Munsey* opinion held or implied that a surety is subrogated *only* to the rights of the subcontractors, or that a payment bond surety has *no enforceable rights* against the government—the principals for which the *Insurance Co. of the West* cites the case. Clearly, in *Munsey*, the surety's subrogation to the rights of the prime contractor could not help it evade the defense of set-off because the same defense could be raised with equal force against the subrogated surety. *Nemo dat quod non habet*. So that aspect of subrogation was not explored by the Supreme Court. *See Munsey*, 332 U.S. at 240 ("Insofar as the [the party representing the surety's interests] in the Court of Claims asserted the contractor's title to the sum in dispute, that court was under statutory duty to recognize the undisputed claim for damages of the United States.") (citing *Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536 (1946)). The surety's inability to improve its lot by asserting the prime contractor's rights, *vis-a-vis* the government's set-off claim, is exactly what caused it to argue "that it is subrogated *also* to the rights of the laborers and materialmen whom it paid." *Id.* (emphasis added). The statements in *Munsey* must be read in the context of the entire opinion and cannot be parsed, lest they be given unintended meanings.

*Blue Fox* dealt only with the rights of a subcontractor suing the government, and not a surety.  Put simply, the opinion did not address the doctrine of equitable subrogation, and to boot was an APA case, not a Tucker Act case.  Similarly, defendant's reliance on the *dicta* in *Insurance Co. of the West* is unavailing because the court's language appears to be facially inconsistent with both Supreme Court and Federal Circuit precedent, and if construed that way would even contradict other language in *Insurance Co. of the West*.[17]  It is beyond peradventure that this court has a duty to construe *Insurance Co. of the West* in a manner consistent with controlling precedent. *See, e.g.*, *Schor v. Commodity Futures trading Comm'n*, 740 F.2d 1262 (D.C. Cir. 1984) (courts under duty to construe statutes harmoniously where that can reasonably be done), *vacated on other grounds*, 473 U.S. 922 and 473 U.S. 922 (1985). *See also United Elec. Corp.*, 647 F.2d at 1085-86; *USF&G*, 475 F.2d at 1381-82 (construing *Pearlman* in harmony with *Munsey*, so as to avoid conflict between the two decisions).

All this leaves unresolved only one question:  If the court in *Insurance Co. of the West* believed that the prior surety subrogation cases could no longer be construed to establish a waiver of sovereign immunity, then by what route did the court find jurisdiction?  The answer, perhaps surprisingly, stems from the analysis of the Federal Tort Claims Act ("FTCA") (28 U.S.C. §§ 2671 *et. seq.*) in a 1949 Supreme Court case.

In *Aetna Casualty & Surety Co.*, 338 U.S. 366 (1949), the Supreme Court analyzed the waiver of sovereign immunity in the FTCA and concluded that it should be construed to extend to a subrogee—that is, that an insurance company subrogated by payment to its insured is itself able to bring suit under the FTCA in the surety's own name notwithstanding the Anti-Assignment Act (now codified at 31 U.S.C. § 3727). *See Aetna*, 338 U.S. at 367-68, 380.  In *Insurance Co. of the West* the court interpreted *Aetna* to stand for "a broader and more generally applicable legal principle," namely:

> waivers of sovereign immunity applicable to the original claimant are to be construed as extending to those who receive assignments, whether voluntary assignments or assignments by operation of law, where the statutory waiver of sovereign immunity is not expressly limited to waivers for claims asserted by the original claimant.

*Ins. Co. of the West*, 243 F.3d at 1373.

---

[17] Defendant also raised a policy issue, arguing that permitting a payment bond surety to subrogate to the rights of the contractor and seek reimbursement from the government "converts the Government into an insurer for the surety against losses precipitated by the contractor with whom the surety entered into a contract." Def.'s Mot. at 12.  This is hardly a concern.  If the surety seeks reimbursement from the government, any reimbursement is only available from funds already earned under the contract between the government and the contractor.  If the government has a defense of lack of performance or consideration against the contractor, that defense is good against the surety, as well.  Provided that the government does not improperly pay the wrong party, it is not liable to the surety for anything that the government would not have to pay to some party, anyway, be it the surety or the contractor.

Applying this rationale to the waiver of sovereign immunity in the Tucker Act, the court concluded that the Act "contains an unequivocal expression waiving sovereign immunity as to claims, not particular claimants," and that the waiver of sovereign immunity was therefore not limited merely to the original claimant but could extend to a subrogee (who takes an assignment by operation of law) as well. *Id.* at 1373-74. Accordingly, the court concluded that "a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States." *Id.* at 1375.

Because plaintiff here became subrogated to the rights of EFSI when it honored the payment bond, and therefore "stepped into the shoes of a government contractor" according to the rationale of the Federal Circuit that is binding on this court, it is clear that plaintiff is entitled to avail itself of the waiver of sovereign immunity in the Tucker Act. For that reason, plaintiff has standing to sue defendant in this case, and this court has jurisdiction over the case.

## III. THE SUMMARY JUDGMENT MOTION

In the alternative to its motion to dismiss, defendant moved for summary judgment on two prongs. First, defendant argues that plaintiff has failed to establish that it has paid *all* of the claims of EFSI's subcontractors *in full*, which defendant argues is a legal prerequisite for a surety to recover against the government. Second, with respect to plaintiff's claim that defendant wrongly paid the October 2001 performance payment to EFSI, defendant argues that it had no notice that plaintiff honored the payment bond before March 18, 2002 when it paid EFSI, so as a matter of law there was no wrongful payment.

### A. Standard of Review

Under Rule 56(c) of the Rules of the Court of Federal Claims ("RCFC"), the court should grant a motion for summary judgment if it determines that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987); *Paxson Elec. Co. v. United States*, 14 Cl. Ct. 634, 642 (Cl. Ct. 1988). Any reasonable inferences of fact that the court draws must be construed in the light most favorable to the non-moving party. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Factual disputes that are merely tangential will not be regarded by the court in determining whether to grant summary judgment. *Anderson*, 477 U.S. at 247. A fact is tangential if it has no bearing on the ultimate outcome of the case. *Id.* If, however, the non-moving party produces sufficient evidence demonstrating a disagreement of material fact, the motion for summary judgment should be denied. *Big Chief Drilling Co. v. United States*, 15 Cl. Ct. 295, 299 (Cl. Ct. 1988).

To aid the court in making these determinations, the moving party bears the burden of identifying both the legal and factual bases for its motions and the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may oppose a motion for summary judgment by showing an evidentiary conflict on the record, but mere denials or conclusory statements by the non-moving party are insufficient to create an issue of fact that will preclude summary judgment. *Mingus*, 812 F.2d at 1387.

**B. Satisfaction in Full of Insured Debts**

Defendant argues that "Liberty has not established that it paid all of the subcontractors' claims in full" and is therefore not eligible to claim subrogation at all. Def.'s Mot. at 17. The court rejects this argument.

Clearly, it is the law that until a surety has undertaken to pay all of the outstanding claims owed by a contractor, it will not be permitted to share in any retained funds owed by the government on the contract. *USF&G*, 475 at 1381; *see also Balboa*, 775 F.2d at 1161; *Am. Fid. Fire Ins. Co. v. United States*, 513 F.2d 1375, 1378 (Ct. Cl. 1975) ("The question of standing to sue is raised by the Government because of the rule that in order for a surety to share in the fund unexpended under the contract, it must first pay all of the claims of the laborers and materialmen."); *see also* RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY § 27 & cmt. 3. This is the rule even if the subcontractors' total claims exceed the face amount of the surety's bond. For example, in *USF&G*, the surety had deposited the full value of its payment bond into the registry of the court to pay subcontractor claims, but the bond amount was insufficient to cover all of the subcontractors' claims. *USF&G*, 475 F.2d at 1381. The Court of Claims concluded that "[u]ntil this surety undertakes to pay all of the outstanding claims owed by [the prime contractor], it will not be permitted to share in retainages still held by the Government." *Id.*

Here, defendant offers the tepid argument that "[n]o where in the complaint does Liberty allege that it has fully reimbursed all of the subcontractors' claims." Def.'s Mot. at 18. While it is true that nowhere in the complaint does plaintiff specifically state that it has paid "all" outstanding claims, and this might be viewed as an error in the pleading, the complaint and supporting exhibits clearly indicate that plaintiff has indeed paid claims of EFSI's subcontractors. Whether or not the claims that plaintiff has paid constitute "all" of the outstanding claims is a factual issue, and defendant has not presented any affirmative evidence of any outstanding claims that plaintiff has failed to satisfy. While defendant's burden at the summary judgment stage is not to come forward with affirmative evidence undermining plaintiff's claim, but rather only to point to an absence of evidence tending to support the claim, by providing evidence of claims that it has paid plaintiff has succeeded in creating a genuine issue of material fact as to whether those paid claims constitute "all" claims. This is sufficient to overcome summary judgment on this issue. *See*, *e.g.*, *Celotex*, 477 U.S. at 323-35.

Surely, if evidence arises indicating that plaintiff has not paid all outstanding claims, it would undermine plaintiff's ability to seek reimbursement. *See USF&G*, 475 at 1381. But in the absence of any such evidence at this summary stage of proceedings, it is sufficient that plaintiff has alleged payment to EFSI's subcontractors and provided affirmative evidence of those payments. As a matter of proof, of course, plaintiff at some point will be required to demonstrate that it has in fact paid "all" claims, though in the absence of contrary evidence this is not a difficult standard to satisfy. *See Int'l Fid. Ins. Co. v. United States*, 25 Cl. Ct. 469, 474 (1992) ("[Plaintiff] submitted an affidavit from an attorney responsible for paying these claims stating that, to her knowledge, all payment bond claims . . . had been paid. . . . We conclude that [plaintiff] has satisfactorily proved that it paid all payment bond claimants.").

Second, defendant proffers a fall-back position and notes that the "documents produced in discovery establish that Liberty did not pay the entire claim submitted by two of the subcontractors." Defendant specifically cites the two subcontractors, Rosewood Contracting Corp. and AKF Engineers, LLP, with whom plaintiff disputed the original claims and later paid a portion of the original claim in exchange for a full legal release.  In short, plaintiff settled the claims with these subcontractors.  Defendant seems to argue that by paying the subcontractors something less than the original claims, plaintiff acted inequitably and has not satisfied the requirement that a surety satisfy all the claims of all subcontractors prior to asserting subrogation.

This argument is not tenable.  As the Supreme Court has noted, a "surety liable only for part of the debt does not become subrogated to collateral or to remedies available to the creditor unless he pays the whole debt *or it is otherwise satisfied.*" *United States v. Nat'l Sur. Co.*, 254 U.S. 73, 76 (1920) (emphasis added).  There can be no real dispute here that, in settling the claims of EFSI's subcontractors to the mutual satisfaction of both plaintiff and the subcontractors, and obtaining in exchange a full legal release of any rights the subcontractors might otherwise have against either plaintiff or EFSI, plaintiff has succeeded in *satisfying* the debts owed to those subcontractors.  *See Int'l Fid. Ins. Co.*, 25 Cl. Ct. at 474 (concluding that statement that "all payment bond claims . . . had been paid, settled, or were barred by the statute of limitations . . . satisfactorily proved that [the surety] paid all payment bond claimants").[18]

## C.  Alleged Wrongful Payment and Notice

Finally, defendant argues that it is entitled to summary judgment that its March 18, 2002 payment to EFSI (of the October 2001 performance payment) was proper.  Defendant claims that it had no notice from plaintiff that plaintiff was honoring its payment bond, and that such notice is an

---

[18] The Seventh Circuit has addressed this same issue on point, albeit in the realm of suits against private parties (where the rule of satisfaction of all claims applies with equal force):

> There are cases that hold that the settled law is that payment of the whole debt on which a surety is liable is essential to subrogation.  The language of those cases, abstractly considered, might seem to support appellant's contention, as appellee surety company did not pay the full face of the claim, and therefore it has no right to subrogation.  No such construction can be placed upon the cases cited, because the facts there showed that one obligated to make payments paid only a part of the whole claim which it was obligated to pay, and did not take a transfer of the whole of the claim.  The part of the claim which it did not pay was not extinguished, whereas in the case at bar the surety company, while paying in some cases perhaps something less than the face value of the claims, wholly extinguished the rights of the several holders of the claims assigned to it and became itself the only creditor.  Under such circumstances, the reasons suggested in the cases above cited why there could be no subrogation are without force.

*Freeman & Brooks Alexander Lumber Co. v. Aetna Cas. & Sur. Co.*, 1 F.2d 430, 434 (7th Cir. 1924).

essential predicate to any wrongful payment claim by a surety.  According to defendant, "a surety bringing suit based upon payments it made to subcontractors, pursuant to a payment bond, can only recover funds that the Government paid the prime contractor *after* the surety notified the Government that it should withhold further payment to the prime contractor."  Def.'s Mot. at 16 (citing cases).

By contrast, plaintiff maintains that it did provide timely notice to defendant when it filed the motion in bankruptcy court on February 19, 2002 to lift the automatic stay so that plaintiff could pursue available remedies, including any claims against defendant.  Plaintiff argues that the notice requirement cited by defendant is less rigid when, as here, the contract performance has been completed or defaulted than it is in a case where the contractor continues to perform.  Moreover, according to plaintiff, defendant was sufficiently aware of plaintiff's interest in the retained contract funds when defendant paid EFSI in March 2002 because by that point EFSI had abandoned performance, defendant had terminated the contract and notified plaintiff of the termination, defendant had notified plaintiff of defendant's interest in having plaintiff honor its performance bond, and plaintiff had filed its motion in bankruptcy court indicating plaintiff's likely course of action.

The resolution of this issue is complex.  Indeed, the court would be required to apply a Spartan body of case law to a unique set of facts.  To be sure, it appears that the court would have to resolve whether such a notice requirement is a hard and fast, unbending rule.  *Compare Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 498 (Fed. Cir. 1990) ("[T]he government as obligee owes no equitable duty to a surety like Fireman's Fund unless the surety notifies the government that the principal has defaulted under the bond.") *with Nat'l Sur. Corp. v. United States*, 118 F.3d 1542, 1547 (Fed. Cir. 1997) ("When the contractor abandoned performance before completion, as did Dugdale, and the government had knowledge of the default, as here, and so informed the surety, as here, *Fireman's Fund* does not impose a further requirement that the surety notify the government that 'the principal has defaulted.'").  In attempting to determine which of these precedents better accommodates the particular facts of this case, the court would be required to resolve sensitive legal issues such as whether a bankruptcy court filing might constitute appropriate notice, and whether and under what circumstances a notice requirement might be obviated by a pragmatic approach.  Federal courts, however, are duty bound to resolve even the greatest of enigmas, so long as there is a proper case or controversy, as there is here.

Nevertheless, even this duty is not absolute.  Certainly circumstances arise, such as conflicts-of-interests, whereby the court should not resolve a claim or issue. *See generally Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988) (discussing requirement that a judge or magistrate recuse or disqualify himself in situations where the judge's impartiality might reasonably be questioned).  Here, there is another legitimate reason.  The court is concerned that resolution of this issue may very well be premature or unnecessary.  Plaintiff's allegations for reimbursement arise out of payments made to the subcontractors under the payment bond.  This claim totals just over $1.4 million.  The reimbursement may be had from three sources: (1) from the alleged wrongful payment, the subject of the instant motions, (2) from the November 2001 performance payment that EFSI earned but defendant has not paid to any party, or (3) out of nearly $5 million in capital improvement costs that plaintiff argues EFSI incurred under the contract but has not yet been paid. *See* Compl. at 6-7. While defendant disputes that EFSI (and, by extension, plaintiff) is entitled to recoup the capital improvement costs, none of the factual and legal issues related to the capital improvement costs claim or the November 2001 performance payment were raised in the instant motions.

As a practical matter, resolution of the legal *bone fides* of plaintiff's claim for capital improvement costs might very well obviate the need to address the instant wrongful payment claim on notice grounds.  Prudence, consequently, dictates from which source the court will consider the most appropriate to render the award, if indeed plaintiff is legally entitled to its claimed reimbursements from more than one fund.  But as of now, that determination is premature.  The determination can wait until trial (or, what is more likely given the court's requirement for pre-trial briefing, pre-trial).

It is possible, then, that the unnecessary resolution of the notice issue at the present might constitute a hypothetical rendering of the law—an advisory opinion long recognized as being prohibited.  *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998) ("Hypothetical judgments . . . come to the same thing as an advisory opinion, disapproved by [the Supreme] Court from the beginning.") (citing *Muskrat v. United States*, 219 U.S. 346, 362 (1911); *Hayburn's Case*, 2 Dall. 409 (1792)).  A court should not rush to resolve complex legal issues when it is uncertain whether such an evaluation is even necessary.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion to dismiss for lack of jurisdiction is **DENIED**.  Defendant's alternative motion for summary judgment is, likewise, **DENIED**.

s/*Lawrence J. Block*

**Lawrence J. Block,**
**Judge**